# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

---------------------------------------------------------------------

**LIBERTY MUTUAL INSURANCE COMPANY, and**
**LIBERTY MUTUAL GROUP, INC.**

                      **Plaintiffs,**

**v.**                                                 CIVIL ACTION NO.

**ASHLEY TRANQUIST and**
**TRANQUIST INSURANCE GROUP, LLC,**          FEBRUARY 24, 2016

                      **Defendants.**

---------------------------------------------------------------------

## COMPLAINT

Plaintiffs Liberty Mutual Insurance Company and Liberty Mutual Group, Inc.

(collectively, "Liberty Mutual") for their complaint allege as follows:

## INTRODUCTION

1.      By virtue of this claim, Plaintiffs seek to obtain injunctive relief against, and

recover damages from, Defendants Ashley Tranquist ("Tranquist") and Tranquist Insurance

Group, LLC ("Tranquist Insurance Group").

2.      In brief, Plaintiffs seek relief arising from, among other things, Tranquist's breach

of her contractual and common law duties owed to Plaintiffs, including without limitation breach

of her Non-Solicitation, Non-Disparagement and Confidentiality Agreement, a copy of which is

attached hereto as Exhibit A.  In particular, Tranquist, a former Liberty Mutual sales

representative and associate, and Tranquist Insurance Group, the company she established (while

still employed by Liberty Mutual) to compete against Liberty Mutual, have engaged, and are

engaging, in efforts to target Plaintiffs' existing and/or prospective policyholders to replace their

insurance policies with, and/or purchase insurance policies of, a competitor, and have conducted business with such policyholders since leaving Liberty Mutual.

3.      Tranquist also has misappropriated Liberty Mutual's trade secrets and confidential information, infringed Liberty Mutual's trademarks, and violated Liberty Mutual's domain name rights.

## PARTIES, JURISDICTION AND VENUE

4.      Plaintiff Liberty Mutual Insurance Company is a Massachusetts insurance company with a principal place of business at 175 Berkeley Street, Boston, Suffolk County, Massachusetts.

5.      Plaintiff Liberty Mutual Group, Inc. is a Massachusetts corporation with a principal place of business at 175 Berkeley Street, Boston, Suffolk County, Massachusetts.

6.      Defendant Ashley Tranquist, upon information and belief, resides at 6 Winding Brook Lane, Wallingford, CT 06492.  Tranquist works for Tranquist Insurance Group and, upon information and belief, is the owner of Tranquist Insurance Group.

7.      Defendant Tranquist Insurance Group is a limited liability company organized under the laws of Connecticut with a principal place of business at 420 Center Street, Floor 1, Wallingford, CT 06492.

8.      Federal question jurisdiction exists pursuant to 28 U.S.C. §1331 because Liberty Mutual is asserting a claim under the Anticybersquatting Consumer Protection Act, 15 U.S.C. §1125(d) as well as claims alleging infringement of a Registered Trademark in violation of 15 U.S.C. §1114 and unfair competition in violation of 15 U.S.C. §1125(a).

9.      Venue is proper in this District pursuant to 28 U.S.C. §1391.

## FACTS COMMON TO ALL COUNTS

10.     Liberty Mutual offers a wide range of property-casualty insurance products and services to both individuals and businesses, including personal automobile, homeowners, personal liability and life insurance.

11.     Liberty Mutual has been providing products and services in the insurance and financial services industries for many years.  The Liberty Mutual name is widely recognized and associated by the public with the quality insurance products and services that Liberty Mutual provides.

12.     Liberty Mutual and its affiliates engage in extensive marketing and advertising campaigns to promote the Liberty Mutual name, its insurance products and its claims handling.

13.     Liberty Mutual's customers are its policyholders.  Policyholders and prospective policyholders seeking Liberty Mutual insurance provide sensitive and confidential information to Liberty Mutual in order to determine the extent of coverage (including any potential exclusions) and to calculate a price (commonly referred to as a premium) for such insurance coverage.

14.     If the policyholder or prospective policyholder agrees to the terms of, and premium for, Liberty Mutual insurance coverage, Liberty Mutual prepares the insurance contract (*i.e.* insurance policy) and the policyholder and Liberty Mutual then execute it, thereby creating a contract for insurance.  The policyholder is obligated to make the specified premium payments and Liberty Mutual is obligated to provide the specified insurance coverage.

15.     Liberty Mutual's insurance revenues are based, in large part, on the premiums it receives from its policyholders.

16.     Liberty Mutual employs sales representatives and associates to market, promote and sell its products, and provides them resources and facilities of a full-service insurance firm as well as ongoing professional and operational training and support to assist them in performing their duties.

17.     Liberty Mutual provides its sales personnel with existing policyholder business as well as customer leads.  Moreover, Liberty Mutual also develops agreements or relationships with groups, such as companies and associations, that allow Liberty Mutual to market and sell Liberty Mutual products to the group members and/or their clientele, and have the groups and their personnel serve as referral sources for prospective policyholders.

18.     Two such group relationships at issue here are Liberty Mutual's relationships with Subaru and Atlantic Home Loans.

19.     In addition to its headquarters in Massachusetts, Liberty Mutual operates its personal lines business primarily through a network of local sales offices.  The vast majority of its sales representatives and associates are housed in these local offices.

20.     Liberty Mutual has a local sales office located at 101 Barnes Rd., Wallingford, Connecticut (the "Wallingford Office").

21.     The term "Liberty Mutual" is a federally registered and protected trademark of Liberty Mutual Insurance Company.

22.     Among other registered trademarks of Liberty Mutual, "Liberty Mutual" is listed on the Principal Register of the United States Patent and Trademark Office, Registration No. 1405249 (August 12, 1986) and Registration No. 2734195 under International Class Code 036 for insurance and financial services.  These federal trademark registrations provide Liberty

Mutual with nationwide protection of its trademarks in the United States as well a cause of action against infringers under the Lanham Act, 15 U.S.C. §§ 1051-1127.

23.　　Liberty Mutual maintains a website under the domain name www.libertymutual.com, among others, where it provides information about and promotes its insurance products and services to the general public.

**Tranquist Joins Liberty Mutual with no Experience,**
**Is Trained and Performs Her Sales Role on Behalf of Liberty Mutual**

24.　　In May 2010, Tranquist applied for employment with Liberty Mutual for a position as an intern.  Tranquist had no prior experience working in the insurance industry.  In fact, she was still attending college.  Nevertheless, Liberty Mutual hired her into an intern position in its Wallingford Office.  Tranquist was assigned to, and worked out of the Wallingford Office, until her August 2014 resignation.

25.　　In or around June 2011, Tranquist was moved into a sales representative position and began her training.  She had no insurance licenses or appointments.  Liberty Mutual assisted and aided her in studying, preparing for and taking the requisite examinations to obtain her insurance license.

26.　　Liberty Mutual provided Tranquist with a salary and benefits that allowed her to devote her time to learning the insurance industry and Liberty Mutual's products and processes and eventually to soliciting, servicing and developing customer business for Liberty Mutual.

**Liberty Mutual Provides Tranquist With Confidential Information
and the Means to Develop Relationships with Its Policyholders**

27.     During Tranquist's employment, Liberty Mutual provided her considerable and
ongoing professional and operational training and support to enable her to successfully perform
her duties.

28.     Such support included a comprehensive training program and training materials,
prospecting tools and software, compliance training and assistance, marketing materials, access
to Liberty Mutual's products and services, client support services, new business processing and
group employment benefits.

29.     Indeed, Liberty Mutual provided Tranquist the resources and facilities of its full-
service insurance firm, including without limitation office facilities, support services, computer
software and equipment, research, advertising, and access to and use of Liberty Mutual's
insurance expertise.  Liberty Mutual also supplied back-office support, including compliance,
underwriting, customer service, claims, and operations departments.

30.     Liberty Mutual provides direct assistance and support to its sales representatives
and associates, including Tranquist, by reassigning former and current Liberty Mutual
policyholders, by generating policyholder referrals and policyholder leads, and by identifying
potential policyholders that appear to be particularly well-suited for the types of products Liberty
Mutual offers.  This assistance and support provides them with opportunities to offer additional
products and services to Liberty Mutual policyholders and prospects.

31.     Tranquist, as do other Liberty Mutual sales representatives and associates, also
derived substantial benefit from Liberty Mutual's promotional marketing and advertising, and
from the considerable goodwill and recognition associated with the Liberty Mutual name.

32.     In addition, Tranquist benefited from some of Liberty Mutual's group marketing programs, especially with Subaru and Atlantic Home Loans, Inc. ("Atlantic Home").  For example, several years ago, Liberty Mutual entered into a national marketing agreement with Subaru titled the "Subaru Advantage Insurance Program."  Under the program, local Subaru dealerships offer Subaru customers the opportunity to receive quotes for insurance coverage underwritten by Liberty Mutual.  If the customer wants to receive a quote, a Subaru dealership representative forwards the customer's information to Liberty Mutual and Liberty Mutual sales representatives or associates prepare a quote for the Subaru customer.

33.     As part of the Subaru Advantage Insurance Program, Tranquist was a lead contact person for Liberty Mutual for the Premier Subaru dealership in Branford, Connecticut.  Tranquist actively worked with Premier Subaru, traveling to the dealership on approximately a weekly basis and spending time there soliciting and developing relationships and goodwill with the Subaru personnel.  In addition, she spent considerable time on the telephone soliciting and developing relationships with Premier Subaru personnel.  Through its relationship with Premier Subaru, Liberty Mutual's Wallingford Office received a significant number of customer leads and developed a significant number of policyholders.

34.     Liberty Mutual also had a marketing agreement with Atlantic Home, whereby Liberty Mutual markets to Atlantic Home customers -- the Liberty Mutual/Atlantic Home Program.  Tranquist actively solicited and worked with Atlantic Home, often traveling to its offices and spending time there soliciting and developing relationships and goodwill with the Atlantic Home personnel as well as communicating with Atlantic Home personnel via telephone.

Liberty Mutual's Wallingford Office developed leads and policyholders through this relationship.

35.    At the expense of Liberty Mutual, Tranquist also visited different Liberty Mutual corporate locations in order to experience first-hand the scope of Liberty Mutual products, support and resources, as well as off-site training.

36.    Tranquist benefited from Liberty Mutual's policyholder business and leads. By way of example, Liberty Mutual reassigned established customers to her and provided her with leads on other established customers who provided opportunities for selling new products.

37.    As a result of the training, support and resources provided by Liberty Mutual, Tranquist, in her roles as Liberty Mutual sales representative and associate, gained access to Liberty Mutual's existing and prospective policyholders, and helped to develop, maintain and enhance long-term relationships with many of the policyholders and referral sources she was assigned to solicit and/or service.

38.    Those existing and prospective policyholder and referral relationships are the lifeblood of Liberty Mutual's business. Indeed, Liberty Mutual strategically uses its sales representatives and associates, including Tranquist, as the face of Liberty Mutual to interact closely and develop trusting relationships with Liberty Mutual's policyholders and referral sources.

39.    Tranquist's job involved contacting and arranging meetings with existing and prospective policyholders/referral sources, determining the needs and preferences of policyholders/referral sources, soliciting those policyholders/referral sources, introducing

product lines to those policyholders/referral sources and selling to and servicing the needs of those policyholders/referral sources, all for Liberty Mutual.

40.     In the course of performing these functions, Tranquist was required to develop information about, and gather information from, existing or prospective policyholders and referral sources concerning the policyholders' insurance needs.

41.     Policyholder and referral sources information is treated by Liberty Mutual as highly confidential and valuable.

42.     Tranquist would also be provided information concerning existing or prospective policyholders from underwriting.  That information would be used to determine the scope of coverage, exclusions and pricing of premiums for specific insurance products and services for each actual or potential policyholder.

43.     Thus, by virtue of her position with Liberty Mutual, Tranquist had access to the confidential, proprietary and competitively-sensitive books, records and information of Liberty Mutual, and the confidential information and trade secrets contained therein, including without limitation product type, coverage, premium and exposure levels, limits, expiration dates and policyholder contact information.

44.     To enable Tranquist to perform her job and to develop those policyholder and referral source relationships, Liberty Mutual also gave her access to sales strategies, quoting tools, pricing, and prospecting tools.

45.     During her tenure at Liberty Mutual, Tranquist used Liberty Mutual's policyholder and referral source information, leads and other resources to sell and service many Liberty Mutual policies.

46.     Given the highly competitive nature of the insurance industry, the confidential information to which Tranquist had access was extremely valuable to Liberty Mutual and would be of great value to its competitors.  Accordingly, Liberty Mutual undertakes reasonable efforts to ensure that the secrecy of its information is maintained, such as personnel, including Tranquist, executing agreements with restrictive covenants designed to protect against the improper disclosure and use of confidential information; Liberty Mutual developing and implementing policies and procedures to protect confidential information; password protecting at multiple levels of use all computers (and not just upon entry) with passwords that must be changed periodically; and locking offices during non-business hours (and are often protected further by way of an electronic entry/exit monitoring system).

**Tranquist Executes Agreements Containing Confidentiality and Restrictive Covenants**

47.     In connection with, and as a condition to be eligible for, the 2011 and 2012 US Sales Representatives Compensation Plan, Tranquist executed Non-Solicitation, Non-Disparagement and Confidentiality Agreements.  A true and accurate copy of the 2012 agreement is attached hereto as Exhibit A ("Tranquist Agreement").

48.     Pursuant to the Tranquist Agreement, Tranquist agreed, among other things, to maintain the confidentiality of Liberty Mutual's confidential information and to abide by certain post-employment restrictive covenants.

49.     In reliance thereon, Liberty Mutual allowed Tranquist, among other things, to continue her relationship with Liberty Mutual, to have access to highly confidential information and to participate in various programs through which she could receive significant compensation.

Liberty Mutual also provided her with the above-described training and support services and

access to policyholders and leads.

     50.     In the Tranquist Agreement, Tranquist agreed that, for two years following the

termination of employment, she would:

> not solicit . . . quote rates to, accept or receive insurance from, or write, bind or
> broker insurance, of a similar nature to the insurance products and services
> offered by the Company, for any person, firm, agency, partnership or corporation
> who at the time of [Tranquist's] termination is a policyholder of the Company
> assigned to the office or offices in which [Tranquist] worked during the 12
> months preceding [Tranquist's] termination [*i.e.* the Wallingford Office] or who
> [Tranquist] formerly solicited on the Company's behalf[.]

(See Exhibit A, § 2).

     51.     Tranquist agreed further that, for two years following the termination of

employment, she would not:

> otherwise directly or indirectly suggest, advise or attempt to persuade any such
> policyholder to sever or modify the policyholder's relationship with the
> Company, including canceling or failing to renew any policy of insurance issued
> by the Company and to replace it with a policy issued by any other insurance
> company.

(See Exhibit A, § 2).

     52.     Moreover, with respect to trade secrets and confidential information, in Section 1

of the Tranquist Agreement, Tranquist specifically acknowledged and agreed as follows:

> I recognize that I shall be employed in a position that involves a relationship of
> trust and confidence.  During the course of my employment, I may receive,
> develop, otherwise acquire, have access to or become acquainted with trade
> secrets or other confidential and sensitive information relating to the business and
> practices of the Company and/or its customers or potential customers.  It is
> expressly understood and agreed by me that 'trade secrets' shall include, all
> documents, electronic or otherwise, relating to the business of the Company,
> including, but not limited to, policies and manuals, expirations, lists of actual or
> potential customers and documents reflecting the names, addresses, phone
> numbers and e-mail addresses of existing or potential customers, all documents,

computer software or electronic information relating to underwriting criteria,
pricing and profit information, all documents relating to processes, future plans,
financial information, promotional ideas, cost and pricing, compilations of
information, and any other documents, computer software or electronic
information or copies of any of the same.   All trade secrets and other confidential
and sensitive information shall remain property of the Company[.]

It is further understood that all such documents and information, whether
originated or prepared by or for me or otherwise coming into my knowledge or
possession while employed by the Company, shall be considered and maintained
as a confidential trade secret of the Company and will not be revealed by me to
any person, firm or corporation (other than the Company) or otherwise utilized by
me following the termination of my employment.  I also agree that I shall not use
such documents and information in any way that may be adverse to the
Company's interest and shall not transfer, reproduce, copy or provide any such
documents and information to any third party, nor cause any such occurrence,
without the specific written consent of the Company.

(See Exhibit A, § 1).

53.    The Tranquist Agreement provides further that:

In the event the Company institutes a lawsuit or action against me for violation of
this Agreement, I agree to pay, in addition to any costs and disbursements
provided by law, reasonable attorney's fees and other expenses of litigation.

(See Exhibit A, § 5).

### Tranquist Establishes a Competing Insurance Business
### and Thereafter Abruptly Resigns from Liberty Mutual

54.    Sometime in early 2014, if not earlier, Tranquist made the decision to leave

Liberty Mutual and start a competing business.

55.    Tranquist filed papers with the Connecticut Department of State to establish

Tranquist Insurance Group, which became official in June 2014.

56.    Pursuant to Liberty Mutual's Code of Business Ethics and Conduct ("Code of

Conduct"), Tranquist was prohibited from engaging in outside work that may compete with

Liberty Mutual.  Tranquist was well-aware of the terms of the Code of Conduct.

57.     On August 1, 2014, Tranquist, without notice, abruptly informed Liberty Mutual that she was resigning.  Tranquist informed a Liberty Mutual sales representative with whom she worked closely that she had left two stacks of papers on his desk that she claimed was everything she was working on.

58.     Upon information and belief, Tranquist immediately began working full-time for Tranquist Insurance Group, which is located at 420 Center Street, Floor 1, Wallingford, CT, approximately 3 miles from the Liberty Mutual Wallingford Office.

**Tranquist Violates the**
**Confidentiality and Restrictive Covenants in the Tranquist Agreement**

59.     After Tranquist left Liberty Mutual, the Wallingford Branch Manager visited Premier Subaru.  Premier Subaru personnel informed the Branch Manager that Tranquist had visited and solicited Premier Subaru personnel to do and/or refer business to her and Tranquist Insurance.  These were the same Premier Subaru personnel she had solicited and worked with on behalf of Liberty Mutual prior to her resignation.

60.     Similarly, the Branch Manager contacted Atlantic Home to set up a meeting to inform them that Tranquist was no longer with Liberty Mutual and to continue the relationship.  However, Atlantic Home was reluctant, telling the Branch Manager that it already knew that Tranquist had left Liberty Mutual and that she had established her own insurance agency.  Upon information and belief, Tranquist had already communicated this information to Atlantic Home and solicited it.  Atlantic Home said it would get back to the Branch Manager but did not do so despite several follow-up communications from the Branch Manager.

61.     Also, a Liberty Mutual representative has reported that, while attending an event at which Tranquist was also present, the Liberty Mutual representative saw Tranquist speaking

with an Atlantic Home representative, and told him that she would come by his office later in the week.  Upon information and belief, Tranquist has done or attempted to do business with Atlantic Home.

62.    Liberty Mutual has received forms from Liberty Mutual policyholders assigned to the Wallingford Office, and with whom Tranquist had dealings on behalf of Liberty Mutual, cancelling their Liberty Mutual insurance.  Some of these forms were sent from Tranquist Insurance (Fax No. 203-518-4918).  In violation of the Tranquist Agreement, upon information and belief, Tranquist sold new insurance coverage to these policyholders with an insurance company that competes with Liberty Mutual.

63.    As noted above, at the time of her resignation, Tranquist had provided Liberty Mutual two stacks of papers that she claimed was everything she was working on.  However, the Wallingford Office supplied spiral bound notebooks to its personnel who wished to use them for conducting business and Tranquist maintained at least one of these spiral bound notebooks in which she had a practice of making notes regarding her communications with policyholders and referral sources and ongoing work she was performing on behalf of Liberty Mutual.  Upon her resignation, Tranquist did not return (or even mention) the notebook to the sales representative with whom she closely worked or her Branch Manager, and it was not left on or near her desk area.  Liberty Mutual has been unable to locate her notebook and, upon information and belief, therefore believes that Tranquist removed the notebook from Liberty Mutual.

64.    Defendants are interfering with and, upon information and belief, are planning to continue interfering with Liberty Mutual's relationships in violation of the Agreements.

65.     Defendants' improper conduct has caused and is continuing to cause damage and irreparable harm to Liberty Mutual, including the loss of goodwill and the negative impact to Liberty Mutual's relationships, including with its actual and prospective policyholders.

**Tranquist Improperly Registers Domain Names that
Infringe Liberty Mutual's Trademarks and Constitute Cybersquatting**

66.     While the parties were engaged in discussions to resolve Defendants' improper activities against Liberty Mutual – Tranquist secretly registered two domain names: www.libertymutualct.com, and www.libertymutualwallingfordct.com.  Clearly, the "ct" in the first domain name was meant to refer to Connecticut and the "wallingfordct" in the second domain name was meant to refer to Wallingford, Connecticut, where Tranquist was conducting a business competing against Liberty Mutual.

67.     Liberty Mutual did not authorize Tranquist to register any domain names including "Liberty Mutual," and Tranquist had no legitimate or permitted purpose for doing so (and none exists).  Upon information and belief, Tranquist's purpose and intent in registering these domain names was, for the benefit of herself and Tranquist Insurance Group, to deceive visitors to these sites into believing, falsely, that they were doing or potentially doing business with Liberty Mutual, and to divert to Defendants the business and goodwill of Liberty Mutual.

68.     In fact, the web pages associated with the two domain names registered by Tranquist contained advertisements for insurance products, services, and companies that compete with Liberty Mutual.

## FIRST COUNT
### (Breach of Contract)

69.      Liberty Mutual repeats, re-alleges and incorporates by reference each and all of the allegations contained in the preceding paragraphs as if fully stated herein.

70.      The Tranquist Agreement is a binding and enforceable contract between Tranquist and Liberty Mutual that contains reasonable restrictive covenants which are necessary to protect Liberty Mutual's legitimate business interests.

71.      Liberty Mutual fulfilled any obligations to Tranquist under the Tranquist Agreement.

72.      Tranquist has violated and is continuing to violate the Tranquist Agreement.

73.      As a direct and proximate result of Tranquist's unlawful conduct, Liberty Mutual has been damaged, and Tranquist is therefore liable to Liberty Mutual in an amount to be determined by the Court, together with costs, interest and attorneys' fees as allowable by law, and is subject to injunctive relief as set forth herein.

## SECOND COUNT
### (Breach of Fiduciary Duty)

74.      Liberty Mutual repeats, re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs as if fully stated herein.

75.      Tranquist, while employed by Liberty Mutual, was entrusted with confidential information while serving as Liberty Mutual sales representative and associate.

76.      As a result, Tranquist owed Liberty Mutual a fiduciary duty to act in its best interest while employed by Liberty Mutual and not to disclose or use Liberty Mutual's confidential information to harm Liberty Mutual's business interests.

77.     Upon information and belief, Tranquist breached her fiduciary duty to Liberty Mutual by:  (a) misappropriating confidential information and trade secrets; (b) using that information to unfairly compete against and injure Liberty Mutual; (c) furnishing that information to Tranquist Insurance Group and/or competing insurance carriers; and/or (d) using Liberty Mutual's time, resources and/or confidential information to set up and promote a competing business.

78.     As a direct and proximate result of Tranquist's unlawful conduct, Liberty Mutual has suffered and is continuing to suffer damages.

79.     As a consequence thereof, Tranquist is liable to Liberty Mutual in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law, and are subject to injunctive relief as set forth herein.

## THIRD COUNT
### (Conversion)

80.     Liberty Mutual repeats, re-alleges and incorporates by reference the allegations contained in each and all of the preceding paragraphs as if fully stated herein.

81.     Liberty Mutual maintains detailed and comprehensive records concerning (among other things) its policyholders.  Liberty Mutual has a property interest in those records and the information contained therein.

82.     Tranquist acknowledged and agreed that such records were the sole and exclusive property of Liberty Mutual.

83.     Tranquist agreed also not to disclose the trade secrets and confidential information contained in those records to any third party or to use that information for her personal gain.

84.    Defendants have, for the reasons described above, exercised unauthorized and unlawful dominion and control over Liberty Mutual's property and have thereby converted this property to their own use.

85.    Defendants have diminished the value of Liberty Mutual's property, including its confidential information and trade secrets, by disclosing and using them for Tranquist's own benefit and/or for the benefit of a Liberty Mutual competitor.

86.    As a direct and proximate result of Defendants' unlawful conduct, Liberty Mutual has suffered and is continuing to suffer damages.

87.    As a consequence thereof, Defendants are liable to Liberty Mutual in an amount to be determined by the Court, together with interest, costs and attorneys' fees as allowable by law, and are subject to injunctive relief as set forth herein.

## FOURTH COUNT
### (Tortious Interference with Actual and/or Prospective Contractual and/or Advantageous Relations)

88.    Liberty Mutual repeats, re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully stated herein.

89.    Liberty Mutual has actual and/or prospective contractual and/or advantageous business relations with its existing and prospective policyholders and business associates, including without limitation Subaru and Atlantic Home.

90.    Defendants were aware of those contractual and/or advantageous business relationships.

91.    Without privilege or justification, Defendants intentionally interfered with those relationships by means that were unlawful or improper.

92.     Defendants' tortious interference with Liberty Mutual's contractual and/or advantageous business relationships has caused and will continue to cause damage to Liberty Mutual.

93.     As a consequence thereof, Defendants are liable to Liberty Mutual in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law, and are subject to injunctive relief as set forth herein.

**FIFTH COUNT**
**(Misappropriation of Trade Secrets –**
**Violation of Connecticut Uniform Trade Secrets Act, C.G.S. § 35-50, et seq.)**

94.     Liberty Mutual repeats, re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully stated herein.

95.     The trade secrets which Liberty Mutual seeks to protect include, at least, confidential, proprietary and competitively sensitive information about existing and prospective policyholders, such as names, contact information, financial data, specialized insurance and benefits needs, goals and preferences, claims history, pricing history and other information regarding the policies purchased and held by each policyholder.

96.     This information is not generally known or readily ascertainable through independent development and is valuable and provides Liberty Mutual with an advantage over its competitors.

97.     Liberty Mutual has taken reasonable steps to preserve the secrecy of those trade secrets and confidential information.

98.    Upon information and belief, Defendants obtained these trade secrets by improper means and used them, in breach of Tranquist's obligations to Liberty Mutual including, among other things, fiduciary duties and contractual obligations.

99.    Defendants, by their actions as alleged herein, have engaged in a "misappropriation" or "intended or threatened misappropriation" of Liberty Mutual's "trade secrets" as those terms are defined under the Connecticut Uniform Trade Secrets Act, C.G.S. § 35-50, et seq.

100.    The foregoing conduct of Defendants was willful and malicious.

101.    As a result of Defendants' conduct, Liberty Mutual has been injured and has suffered and will suffer irreparable harm and damage to its business operations.

102.    As a consequence thereof, Defendants are liable to Liberty Mutual in an amount to be determined by the Court, together with interest, costs and attorneys' fees as allowed by law, and are subject to injunctive relief as set forth herein.

## SIXTH COUNT
### (Unjust Enrichment)

103.    Liberty Mutual repeats, re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully stated herein.

104.    Liberty Mutual invested substantial time and financial resources and provided access to its confidential information and trade secrets to assist Tranquist in attracting, servicing and developing relationships with Liberty Mutual policyholders and referral sources.

105.    Tranquist encouraged Liberty Mutual to invest its time and financial resources and to disclose its confidential information and trade secrets to her and was aware of Liberty Mutual's actions in this regard, and knowingly accepted the benefits flowing therefrom.

106.    Due to their actions, as described above, Defendants have been or will be unjustly enriched through the improper use of confidential policyholder information and relationships created and maintained at the expense of Liberty Mutual.

107.    Defendants are therefore required to make restitution to Liberty Mutual for such unjust enrichment.

108.    As a direct and proximate result of Defendants' unlawful conduct, Liberty Mutual has suffered and is continuing to suffer damages.

109.    As a consequence thereof, Defendants are liable to Liberty Mutual in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law, and are subject to injunctive relief as set forth herein.

**SEVENTH COUNT**
**(Violation of Connecticut Unfair Trade Practices Act – C.G.S. § 42-110a et seq.)**

110.    Liberty Mutual repeats, re-alleges and incorporates by reference each and all of the allegations contained in the preceding paragraphs as if fully stated herein.

111.    By virtue of, among other things, the conduct described above, Defendants' acts, conduct and omissions offend public policy as established by statutes and common law; said acts, conduct and omissions are immoral, unethical, oppressive, unscrupulous or unfair to Liberty Mutual; and said acts, conduct and omissions caused substantial injury to Liberty Mutual.

112.    The foregoing acts, conduct and omissions constitute unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Connecticut Unfair Trade Practices Act (CUTPA), Connecticut General Statutes § 42-110a, et seq.

113.    As a result of Defendants' violation of CUTPA, Liberty Mutual has suffered ascertainable loss of money and other harm.

114.    Liberty Mutual also seeks an order permanently enjoining defendants' illegal conduct pursuant to Connecticut General Statutes § 42-110a et seq.

115.    As a consequence thereof, Defendants are liable to Liberty Mutual in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law, and are subject to injunctive relief as set forth herein, including pursuant to Connecticut General Statutes § 42-110a et seq.

## EIGHTH COUNT
### (Injunctive Relief)

116.    Liberty Mutual repeats, re-alleges and incorporates by reference each and all of the allegations contained in the preceding paragraphs as if fully stated herein.

117.    Defendants have no right to take or attempt to take for themselves or any other entity the confidential information, goodwill and relationships created, maintained and developed by and at the expense of Liberty Mutual.  Indeed, Tranquist expressly promised not to do so.

118.    Tranquist signed the Tranquist Agreement and received training and customer contacts and access to sensitive, confidential and trade secret information through her employment with Liberty Mutual.

119.    In spite of contractual, common law and statutory obligations, Defendants have engaged in, are engaging in and/or are preparing to engage in the following unlawful acts:

(a)    soliciting and/or preparing to solicit restricted Liberty Mutual policyholders in an effort to induce those policyholders to terminate their relationship with Liberty Mutual and/or assisting restricted Liberty Mutual's policyholders to alter their insurance coverage;

(b)    selling restricted Liberty Mutual policyholders insurance and/or otherwise servicing their insurance needs or improperly diverting

the business of these policyholders from Liberty Mutual to competitors; and

(c)     removing and converting for Defendants' use confidential and/or trade secret information, including information concerning existing and prospective policyholder information.

120.    Liberty Mutual has no adequate remedy at law and, unless Defendants are enjoined from the foregoing conduct, Liberty Mutual will suffer irreparable harm which outweighs the potential harm (if any) to Defendants if injunctive relief is granted.

121.    The injunctive relief that Liberty Mutual requests against Defendants would merely require Defendants, and those acting in concert with them, to adhere to the Tranquist Agreement and applicable law.

122.    It is unjust and inequitable to permit Defendants to benefit from the deliberate disregard of Tranquist's contractual and legal obligations.

123.    Indeed, Tranquist recognized injunctive relief is appropriate at the time she signed the Tranquist Agreement, representing specifically that she "understands and acknowledges that, in addition to other legal and equitable rights and remedies, the Company shall have the right to injunctive relief to restrain any actual or threatened violations of this Agreement." See Exhibit A, § 4.

124.    As a consequence thereof, Liberty Mutual is entitled to injunctive relief as set forth herein.

**NINTH COUNT**
**(Infringement of a Registered Trademark – 15 U.S.C. § 1114)**

125.    Liberty Mutual repeats, re-alleges and incorporates by reference each and all of the allegations contained in the preceding paragraphs as if fully stated herein.

126.    Defendants' use in commerce of the Liberty Mutual name and mark in connection with the sale, offering for sale, distribution, and/or advertising of goods and services is, and was, likely to cause confusion, mistake, or deception, by creating the false and misleading impression that Defendants' domain name and goods and services are affiliated with or sponsored, endorsed, or approved by Liberty Mutual, all in violation of 15 U.S.C. § 1114.

127.    Defendants' conduct as alleged herein has been intentional, willful, knowing, and in bad faith.

128.    As a result of Defendants' conduct, Liberty Mutual has been injured and has suffered and will suffer irreparable harm and damage to its business operations.

129.    As a consequence thereof, Defendants are liable to Liberty Mutual in an amount to be determined by the Court, together with treble damages, interest, costs and attorneys' fees as allowed by law, and are subject to injunctive relief as set forth herein.

**TENTH COUNT**
**(Violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d))**

130.    Liberty Mutual repeats, re-alleges and incorporates by reference each and all of the allegations contained in the preceding paragraphs as if fully stated herein.

131.    Defendants registered, trafficked in and/or used the domain names www.libertymutualct.com and www.libertymutualwallingfordct.com, which are confusingly similar to Liberty Mutual's registered mark and domain name, www.libertymutual.com.

132.    Defendants had a bad faith intent to profit from Liberty Mutual's mark, including but not limited to, their unlawful intent to divert consumers from Liberty Mutual's online location to a site accessible under the infringing domain names, with the purpose, intent and/or effect of harming the goodwill represented by Liberty Mutual's mark, either for commercial gain

or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of Defendants' site.

133.    Defendants' actions constitute cybersquatting/cyberpiracy, in violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).

134.    As a result of Defendants' conduct, Liberty Mutual has been injured and has suffered and will suffer irreparable harm and damage to its business operations.

135.    As a consequence thereof, Defendants are liable to Liberty Mutual in an amount to be determined by the Court, or to statutory damages pursuant to 15 U.S.C. § 1117(d), together with interest, costs and attorneys' fees as allowed by law, and are subject to injunctive relief as set forth herein.

**ELEVENTH COUNT**
**(Unfair Competition – 15 U.S.C. § 1125(a))**

136.    Liberty Mutual repeats, re-alleges and incorporates by reference each and all of the allegations contained in the preceding paragraphs as if fully stated herein.

137.    Defendants' unauthorized use in commerce of confusingly similar imitations of Liberty Mutual's marks, in connection with Defendants' goods and services, is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Defendants with Liberty Mutual, or as to the origin, sponsorship, or approval by Liberty Mutual of Defendants' goods, services, or commercial activities.

138.    Defendants' actions constitute unfair competition, false advertising, false designation of origin, and/or false or misleading descriptions or representations under 15 U.S.C. § 1125(a).

139.    As a result of Defendants' conduct, Liberty Mutual has been injured and has suffered and will suffer irreparable harm and damage to its business operations.

140.    As a consequence thereof, Defendants are liable to Liberty Mutual in an amount to be determined by the Court, together with interest, costs and attorneys' fees as allowed by law, and are subject to injunctive relief as set forth herein.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court issue the following relief:

1.    An Order permanently enjoining and restraining Defendants, their agents, servants, employees, and all those acting in concert with them, under penalty of contempt of Court, for twenty-four months from her resignation from Liberty Mutual, from directly or indirectly:

A.    soliciting, quoting rates for, accepting or receiving, and/or writing, binding or brokering, insurance of a similar nature to the insurance products and services offered by Liberty Mutual Insurance Company and its affiliates and subsidiaries ("Liberty Mutual"), from or for any person or entity who during the last twelve months of Tranquist's employment with Liberty Mutual was a Liberty Mutual policyholder assigned to the Liberty Mutual, Wallingford, Connecticut Office ("Wallingford Office"), or whom Tranquist formerly solicited on Liberty Mutual's behalf ("Tranquist Restricted Person");

B.    suggesting, advising or attempting to persuade any Tranquist Restricted Person to sever or modify his/her relationship with Liberty Mutual, including canceling or failing to renew any policy of insurance issued by Liberty Mutual and replacing it with a policy issued by any other insurance company;

C.    soliciting or requesting any: (a) Liberty Mutual agent, sales representative, employee or independent contractor ("Liberty Mutual Personnel") to leave the employ of or cease affiliation with Liberty Mutual; (b) Liberty Mutual Personnel to join the employ of any competing business; or (c) competing business to employ any Liberty Mutual Personnel;

      D.     using, disclosing or transmitting for any purpose (including without limitation soliciting or servicing of Liberty Mutual policyholders), all information (including originals, copies, summaries, extracts, or other reproductions, in any form whatsoever) generated or received by Tranquist during her employment with Liberty Mutual relating to the business of Liberty Mutual and/or its policyholders, including without limitation, lists of actual or potential policyholders and documents reflecting the names, addresses, phone numbers and e-mail addresses of existing or potential policyholders, expirations, underwriting criteria, pricing and profit information, future plans, financial information, promotional ideas, and cost and pricing ("Confidential Information").

      2.     An Order permanently enjoining and restraining Defendants, their agents, servants, employees, and all those acting in concert with them, under penalty of contempt of Court, from directly or indirectly using the domain names www.libertymutualct.com and/or www.libertymutualwallingfordct.com, and any and all other domain names containing the Liberty Mutual registered trademark or any confusing similar names, such as by adding prefixes or suffixes.

      3.     An Order directing Defendants, their agents, servants, employees, and all those acting in concert with them, under penalty of contempt of Court, to remove any and all references to "Liberty Mutual" or confusing similar names, such as adding prefixes or suffixes, from any meta tags, HTML code, text, or content on Defendants' websites and, to the extent not already done, to immediately terminate all such domain names and all websites connected with such domain names.

      4.     An Order directing Defendants, their agents, servants, employees, and all those acting in concert with them, under penalty of contempt of Court, to return immediately any and all Liberty Mutual confidential information (including without limitation, lists of existing or prospective Liberty Mutual policyholders, their contact information and other information

regarding them) and any other Liberty Mutual property in any form whatsoever to Liberty Mutual.

5.      Enter judgment in favor of Plaintiffs and against Defendants on all Counts, and order Defendants to pay damages to Plaintiffs in an amount determined by the Court, including but not limited to, treble damages pursuant to 15 U.S.C. § 1117, and including all costs, interest and attorneys' fees allowed by contract and/or law (including Trade Secrets Act, the CUTPA), and punitive damages as allowed by law, including without limitation as provided for in the Trade Secrets Act and the CUTPA.

6.      Enter judgment for statutory damages pursuant to 15 U.S.C. § 1117(d).

7.      Such other and further relief as this Court deems just and proper.

Respectfully submitted,

PLAINTIFFS LIBERTY MUTUAL INSURANCE COMPANY and LIBERTY MUTUAL GROUP, INC.


By: /s/Amanda C. Nugent
    Amanda C. Nugent, Esq. (Fed. Bar. # ct27584)
    Carmody Torrance Sandak & Hennessey LLP
    195 Church Street, 18th Floor
    P.O. Box 1950
    New Haven, CT 06509
    Tel.: (203) 777-5501
    Fax: (203) 784-3199 (fax)
    E-mail:  anugent@carmodylaw.com

    Gary S. Klein, Esq. (Fed. Bar. # ct09827)
    Carmody Torrance Sandak & Hennessey LLP
    707 Summer Street, 3rd Floor
    Stamford, CT 06901
    Tel.: (203) 425-4200
    Fax: (203) 325-8608 (fax)
    E-mail:  gklein@carmodylaw.com


Dated:  February 24, 2016

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing **Complaint** was filed electronically on the above date.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

/s/ Amanda C. Nugent
_____
Amanda C. Nugent
